108 Cal.Rptr.2d 581 (2001)
90 Cal.App.4th 390
CONSERVATORSHIP OF the Person and Estate of Amelia V. RAMIREZ.
Sherrie Ellman, as Coconservator, et al., Petitioners and Respondents,
v.
Nemesio V. Granadino, Objector and Appellant.
No. B145896.
Court of Appeal, Second District, Division One.
June 29, 2001.
Patrick C. Stacker, Long Beach, Howard S. Klein, Los Angeles, Cameron, *582 Pearlson & Foster, Paul R. Pearlson and Susan R. Loh, Long Beach, for Objector and Appellant.
Larry B. Close, Perona, Langer, Beck & Lallande and Ellen R. Serbin, Long Beach, for Petitioners and Respondents.
SPENCER, P.J.

INTRODUCTION
Nemesio V. Granadino appeals from an order appointing Sherrie Ellman and Meryl Gladstone permanent conservators of the person and estate of Amelia V. Ramirez. We reverse the order.

PROCEDURAL AND FACTUAL BACKGROUND
Petitions for appointment of a conservator of the person and estate and for appointment of a temporary conservator were filed April 20, 2000 by professional conservators Sherrie Ellman (Ellman) and Meryl Gladstone (Gladstone), nominated by proposed conservatee Amelia Ramirez's (Ramirez) daughter, Catalina Canizales (Canizales), as both temporary and permanent conservators. In support of the request for appointment of a temporary conservator, the petitioners stated, "Proposed conservatee is 82 years of age and appears to be suffering from forgetfulness. She is not ambulatory and appears to require supervised assistance a substantial amount of the time.
"She resides in her residence where she is accompanied by a part-time companion. Her son is also supposedly at her beck-and-call. She is assisted by her son, who is unemployed[] except for helping his mother. Son states his mother is mentally incompetent and he has a Power of Attorney.
"Son completely controls mother. No-one [sic] can see her without his consent. Locks are changed frequently. Telephone is `blocked' and daughter is unable to call or receive calls from mother. Out of frustration, daughter called Police to gain entrance in November of 1999, and again on April 8, 2000....
"Daughter attempted to resolve matter through mother's attorney, Daniel Baha, who tried to have a meeting with the son and the daughter.... Son refused to attend any meeting. He has also refused to provide evidence that the proposed conservatee is mentally incompetent or documentation regarding his appointment as his mother's agent via a Power of Attorney....
"Proposed conservatee has numerous properties which produce monthly income of more than $7,000 per month.... Son appears to have complete control. Daughter has requested information from brother regarding various financial matters but to no avail. [¶] Daughter has been on a joint account of her mother's since 1993 or 1994. In April of 1999 two telephonic withdrawals were made for $8,343.76 to unknown checking accounts. When daughter asked mother about withdrawals, she had no recollection of any withdrawals, [¶] Daughter believes mother is unable to manage her financial matters and is susceptible to undue influence."
Attached to the petition is a letter written on behalf of appellant, dated August 27, 1999, in which appellant declines to attend a meeting with his sister at the office of one of his mother's attorneys, Daniel Baha. The letter describes appellant's devotion to his mother over the past 40 years and the efforts he has undertaken in the last year to care for her and to abide by her express directives. Appellant accuses his sister of periodic abandonment and estrangement from their mother. Appellant concludes by proposing visitation and care management rules.
*583 The court appointed Ellman and Gladstone temporary conservators of the person and estate of Ramirez on April 20, 2000. A hearing on the petition for appointment of permanent conservators was set for June 19, 2000.
On May 12, 2000, appellant moved for an order terminating the temporary conservatorship and related orders. In support of the motion, appellant submitted a declaration in which he stated that he was "the primary Trustee of the Amelia V. Granadino Ramirez Living Trust dated April 1, 1997 ... and Amendment dated October 1,1997 ." He was "the Attorney-in-Fact of the Amelia V. Granadino Ramirez Uniform Statutory Power of Attorney Asset Management ... dated April 1, 1997." He also was "the appointed Health Care Agent for Health Care Decisions for my mother [under a durable power of attorney] dated April 1, 1997."
According to appellant, in approximately August 1999, he "became concerned that one of my mother's accounts that also had the name of my sister, Catalina Canizales, on it was not being properly administered ... and I changed the account taking my sister's name off of the account. Thereafter, I was faced with many calls and inquiries challenging my attempts at representing my mother whereupon many parties, I believe by the instigation of Catalina Canizales, have attempted harassment of my mother and me.
"... On September 3, 1999, at 1:45 p.m., Juan Jimenez, Adult Protective Services, visited my mother and investigated my mother's condition.... On or about April 10, 2000 at 2:40 a.m. four Los Angeles Policemen were sent to my mother's home to check on elder abuse with the intent of telephonic calls to them to remove her from her home.... On or about April 18, 2000 at 2:45 p.m. Marie Ali of Adult Protective Services came to visit my mother.... On or about April 24, 2000 at 5:20 p.m., again upon telephonic calls from others, my mother was awakened with a visit from the Los Angeles Police Department. ... On April 28, 2000 at 2:00 p.m. Ms[.] Ellman & Gladstone came to the house with the police to attempt to forcibly remove my mother. After discussions with the police, my mother told the conservators that she wanted to stay...."
Appellant attached to his motion the declaration of trust, the October 1, 1997 amendment to the declaration of trust, the asset management power of attorney, the durable power of attorney for health care decisions, police department business cards, Adult Protective Services business cards and Ellman and Gladstone's business cards. The asset management power of attorney contains a nomination of a conservator of the person by which appellant is designated as conservator should the appointment of one become necessary. Rachel Granadino is designated in the event appellant cannot serve.
Appellant also attached the declaration of Hector W. Orozco, who attests that he has been Ramirez's attorney for 30 years. Attorney Orozco declares that appellant "has taken excellent care of" his mother "as a true, loving and caring son.... [Appellant] is the mainstay of the business. The assets and properties that are in [the] trust are operated under his constant care and attention. Without his assistance and influence and daily efforts on behalf of the business and its assets, there would be nothing left.... It is my belief that without [appellant's] continued personal involvement on behalf of [his mother], many things would soon falter.
"... I meet with Amelia frequently and saw her as recently as three ... months ago. It is my personal belief that all the documents she executed in 1997 were done without duress and undue influence and *584 she had full capacity at the time. In fact, she had full capacity the last time I saw her...."
The temporary conservators, Ellman and Gladstone, opposed the motion to terminate the temporary conservatorship. On May 12, 2000, the court continued the hearing on the motion to May 26, 2000. Ramirez was to remain in her home or the home of her son until that time. No assets were to be sold. The court appointed an attorney, Alex Borden, to represent Ramirez. On May 26, 2000, the court again continued the hearing to June 1. On May 30, the court appointed an investigator, Wing Lee (Lee), directing him to interview Ramirez and make certain determinations.
On June 6, 2000, following an evidentiary hearing, the court denied the motion to terminate the temporary conservatorship. The court ordered that appellant and Canizales be allowed to visit Ramirez on alternating days between certain hours. The court suspended all powers of attorney appointing appellant as attorney in fact until further order. Appellant was to prepare and submit to Ramirez's attorney a complete inventory and accounting of all assets then or ever held in the trust. Appellant was not to transfer any trust assets. The temporary conservators were to have complete geriatric physical and mental examinations of Ramirez performed and were to file a report thereon with the court. Appellant and Canizales were not to discuss the legal proceeding with their mother.
On June 19, 2000, the court continued the hearing on the petition for appointment of a permanent conservator of the person and estate to July 31. The court also extended the temporary conservatorship letters until that date.
On June 30, 2000, appellant moved to replace Ramirez's court-appointed attorney, Alex Borden, with her attorney of long standing, Hector Orozco. Appellant also requested other orders. The court denied the motion to replace Attorney Borden. The court ordered that Dr. James Edward Spar and Dr. Gary Freedman-Harvey examine Ramirez. Both doctors were to submit reports to the court. The court further ordered that Canizales and appellant have one individual counseling session each and one joint session with a social/family counselor, who was to submit a report to the court.
On August 1, 2000, the court extended the temporary conservatorship letters until September 11, 2000. The court had continued the hearing on the petition for appointment of a permanent conservator until that date.
On August 9, 2000, Steve W. Cohen, a counselor, submitted his report to the court. Cohen stated that "[b]oth individuals ... agree that there has been conflict between the two of them for approximately 20 years." After reporting on appellant's and Canizales's demeanor and statements during the sessions, Cohen stated his conclusions: "It is obvious that the conflicts within this family have been longstanding. The pattern of communication between the brother, sister and mother have been poor. Both the sister and brother could not offer reasons for lack of attempts to resolve the conflicts.... There have been a number of losses in the family, some violent.... These losses ... probably exacerbate the difficulty in communication.
"[Canizales] appears to be extremely bitter and could very well be motivated by the unresolved issues in her life. She did not convince this writer that her motives are completely in the best interest of her mother. [She] seems to have a limited support system and her difficulty in being *585 open to outside information and recommendations will continue to hamper her judgment and insight, [¶] [Appellant] appears to be much more sincere than his sister. Nevertheless, he has made some poor decisions (e.g., how and why he attempted to put a re[s]training order against his sister instead of trying to reason with her first). He seems to have an adequate support system with his family and church."
On July 25, 2000, Freedman-Harvey, a licensed psychologist, submitted his report to the court. Based on information gathered from a variety of sources, Freedman-Harvey reported that in 1992, Ramirez "had a will drafted by a family attorney; reportedly providing for her two children equally. In the mid-1990s, her attorney made a recommendation to her family to consider probate conservatorship. [¶] In 1997 [Ramirez] signed a newly drafted trust, favoring her son, [appellant], and effectively excluding her daughter, [Canizales]. The document was reportedly drafted by a notary/paralegal, Janet Rieswig." It was unclear to Freedman-Harvey whom Janet Rieswig represented.
According to Canizales, Ramirez "began to forget things, `maybe five years [ago] or so' and definitely was `forgetting more and more ... three years back ... [and] she sees things, like snakes in the wall.'" According to appellant, Ramirez "has been commenting about seeing `a dog' or `somebody' come by, and may be experiencing visual hallucinations. She speaks English, but in recent months, appears to comprehend better in Spanish. Whether in English or Spanish, she is often confused about events."
Freedman-Harvey interviewed Ramirez on July 14, 2000. When asked to count backwards from 20 to 1, Ramirez began with "20," then counted from 1 to 20." When asked to count to 20 by threes, she did not attempt the task. She knew her name, birth date and street address. She did not know the month or year, however. She gave her age as 74 years when she is 83 years old. Ramirez could follow simple two-step directions but could not name common items. She would not attempt to list words in categories except in the category of animals, where she succeeded in naming only two. Her short-term memory has deficits, as has her long-term memory. She appeared to Freedman-Harvey to be unaware of her financial assets.
In Freedman-Harvey's opinion, Ramirez's cognitive impairment and deficits in processing and sequencing information interfere with her abstract reasoning, insight and judgment, as well as decisionmaking. The cognitive deficits "are consistent with a progressive dementia." Ramirez does not have the mental capacity to participate in estate planning decisions. She cannot care for her needs and requires daily home assistance and financial supervision. Freedman-Harvey estimated that there had been some cognitive impairment for more than three years, placing the validity of the trust instrument in doubt.
Dr. Spar, a psychiatrist, submitted his report to the court on August 15, 2000. When Dr. Spar interviewed Ramirez on July 24, 2000, she was able to list considerable real property that she owned. She stated that appellant had been helping her to manage these properties for a long time. She wanted him to continue to do that. She deliberately decided to leave all of her property to her son, explaining that "[m]y daughter don't care for nothing, she would just give it all away." She expected appellant to share some of the property with Canizales, however. The estate division was entirely her idea. Her son had not pressured her.
Tests revealed substantial cognitive impairment. In Dr. Spar's opinion, Ramirez *586 "is suffering moderate to severe dementia, and is certainly unable, on her own, to manage her finances or resist fraud and undue influence.... [S]he is similarly incapable of providing for her physical health needs, food, clothing, or shelter. However, while her knowledge of her estate is incomplete, ... she is still capable of knowing and recollecting, at least for short periods, what she owns, and ... knows who her heirs are, and how they are related to her, and what a will is." Dr. Spar concluded that Ramirez "retains testamentary capacity at this time."
In Dr. Spar's view, it was likely that Ramirez was impaired only mildly in 1997. She was "easily able `to understand and appreciate, to the extent relevant, ... [t]he rights, duties, and responsibilities created by, or affected by the decision[,] ... [t]he probable consequences for the decision maker and ... the persons affected by the decision[, and] ... [t]he significant risks, benefits, and reasonable alternatives involved in the decision' ... with respect to her assignment of durable powers of attorney to [appellant] and her selection of him as trustee and, should she need one, conservator." Dr. Spar therefore recommended against a conservatorship and in favor of appellant's service as trustee and attorney in fact.
The probate investigator's report states that Ramirez "does not have capacity to give an informed consent to medical treatment" or "to complete the Affidavit of Voter Registration...." She did wish to contest the proceeding, however, and did object to the proposed conservator. She appeared to understand the concept of conservatorship. Ramirez was quite confused, however, stating inconsistently that appellant had his own home and that he lived with her. She gave her age as 48 years.
A hearing on the petition for the appointment of permanent conservators commenced on September 11, 2000. Ramirez appeared and testified with the assistance of a Spanish interpreter. When asked whether she knew why she had come to court, Ramirez answered, "Yes, I came here to sign ... the property for my son." Her son had "been taking care of me all the time," and, in her opinion, doing a good job. She would prefer that her son continue to care for her. Her daughter, Canizales, visited her often. Ramirez did not know why her son and daughter had conflicts.
Dr. Spar testified consistently with the contents of his report. When Dr. Spar questioned Ramirez regarding her property, her desired disposition of that property and her preference with respect to her caregiver, he did so repeatedly, approaching these subjects from different directions. Ramirez was consistent in her responses. As best as Dr. Spar could determine, Ramirez's desire that her son continue to care for her and her property was an emotional choice. Dr. Spar acknowledged that Ramirez had not actually told him that she wanted to leave all of her property to her son but that she was leaving him 90 percent and her daughter 10 percent.
Dr. Spar's opinion that Ramirez had capacity in 1997 to execute a trust and powers of attorney was based on two assumptions, that she had Alzheimer's Disease and that it had followed a reasonably typical course. While he doubted that she could have understood exactly the details of the trust instrument, he also doubted that many competent people had that level of understanding. In Dr. Spar's view, Ramirez "would have been able to grasp the essence if it was explained to her." In forming his opinion, Dr. Spar was unaware that Ramirez had made a drastic testamentary *587 change from 1992 to 1997, replacing a will leaving one-half of her estate each to her son and daughter with a trust that left 90 percent to her son. He found it significant, however, that the property disposition set forth in the 1997 trust instrument reflected Ramirez's present wishes.
Shirley Knopf is a retired probate attorney and expert on the standard of care applicable to lay fiduciaries. According to Knopf, the standard of care applicable to a son now managing his mother's property after working closely with her in property management for 20 years would differ from that applicable to a bank operating as a fiduciary. To determine the standard of care, it is necessary to look at the level of sophistication of ordinary people conducting their business and at their life-long practices. When people of minimal education and sophistication manage their property as a cash and carry business and commingle assets, continuing to do so in a fiduciary capacity is not a breach of duty.
In Knopf's opinion, Ramirez trusts appellant based on their long-term relationship in property management. Now introducing a stranger to manage the property would harm the mother-child relationship. It would not be in Ramirez's best interests.
Freedman-Harvey testified consistently with the contents of his report. When he interviewed Ramirez, she gave one- or two-word responses, using very simple words. She did not speak spontaneously. This signaled that "she was functioning with very limited abilities at the time that I saw her" on July 14, 2000. She would be unable to participate in decision-making. At that time, Ramirez's emotional health also was very fragile. She needed the care and support of both her children but in an atmosphere free of the conflict that precipitated the conservatorship petition.
The measurement by which Dr. Spar determined that Ramirez would have been fully competent in 1997 is an unreliable guide to past competence unless there are past measurements. Had the Folstein test been applied to Ramirez in 1992 and every year thereafter, the progress of her decline could be calculated. A present test provides no basis for determining mental competence retrospectively, however.
According to Ellman, since she and Gladstone became temporary conservators, they have had great difficulty in retaining caregivers. Ellman and Gladstone checked daily with Ramirez's caregivers. Several caregivers left because they could not handle the tension between appellant and Canizales. That tension caused considerable strife and interfered with the conservators' care of Ramirez. There were several eruptions of ill will during visits.
In an effort to avoid conflict and reduce tension, Ellman and Gladstone finally designated hours and days during which each child could visit Ramirez. They also told the children that they were to leave the care of their mother to the caregivers, report perceived medical problems to the temporary conservators or the caregivers and refrain from removing any items from the house.
In Ellman's professional opinion, allowing appellant to care for his mother under the powers of attorney would not bring peace to the family. Given the longstanding hostility between appellant and Canizales, giving one of them power over their mother would not promote peace. Ellman acknowledged, however, that appellant had cared well for his mother. Ramirez had not suffered any degree of neglect. She was clean, well groomed and well fed when Ellman and Gladstone first saw her.
In its order appointing a permanent conservator, entered on October 12, 2000, the *588 court found there was clear and convincing evidence that Ramirez "is moderately to severely impaired and unable to properly provide for her personal needs for physical health, food, clothing, or shelter." The court further found she "is substantially unable to manage her financial resources or to resist fraud or undue influence." Accordingly, a conservator of the person and of the estate was necessary. The court presumed valid for purposes of the hearing the two durable powers of attorney but made no findings as to trust validity.[1] Finally, the court found that, "[i]n order to keep the status quo in place and, based upon the findings set forth above, ... [Ellman and Gladstone] should be appointed co-conservators of the person and estate."

CONTENTION
Appellant contends the probate court erred prejudicially in appointing Ellman and Gladstone the permanent conservators. For the reasons set forth below, we agree.

DISCUSSION
Probate Code section 1810 provides: "If the proposed conservatee has sufficient capacity at the time to form an intelligent preference, the proposed conservatee may nominate a conservator in the petition or in a writing signed either before or after the petition is filed. The court shall appoint the nominee as conservator unless the court finds that the appointment of the nominee is not in the best interests of the proposed conservatee." Probate Code section 4126 permits nomination by durable power of attorney of a conservator of the person, estate or both for consideration by the court should conservatorship proceedings thereafter be commenced. (Id., subd. (a).) In proceedings in this state, "the nomination has the effect provided in Section 1810.... "(Id., subd. (b).)
For purposes of the conservatorship hearing, the court deemed valid the durable power of attorney for assets in which Ramirez nominated appellant as her conservator. As set forth above, Probate Code section 1810 requires appointment of the nominee unless the court finds that such appointment is not in the best interests of the proposed conservatee. Relying on this provision, appellant argues that the court's order establishing a conservatorship and appointing Ellman and Gladstone as co-conservators must be reversed. As he sees it, the court failed to make the requisite finding. He is mistaken.
In finding that the status quo should be maintained by appointing Ellman and Gladstone, the court necessarily found that maintaining the status quo was in Ramirez's best interests, for the court always must act in the proposed conservatee's best interests in selecting a conservator. (Prob.Code, § 1812, subd. (a); cf. Guardianship of Brown (1976) 16 Cal.3d 326, 339, 128 Cal.Rptr. 10, 546 P.2d 298.) If maintaining the status quo and appointing Ellman and Gladstone served Ramirez's best interests, then appointing appellant could not have served her best interests. The essential finding necessarily is implied in the actual finding. That is sufficient.
The sole remaining question is whether that finding is supported by substantial evidence. In making that determination, we view the entire record in the light most favorable to the trial court's findings. (Bowers v. Bernards (1984) 150 Cal.App.3d 870, 873-874, 197 Cal.Rptr. 925; accord, Campbell v. Southern Pacific Co. (1978) 22 Cal.3d 51, 60, 148 Cal.Rptr. 596, 583 P.2d 121.) We must resolve all *589 conflicts in the evidence and draw all reasonable inferences in favor of the findings. (Watson v. Department of Rehabilitation (1989) 212 Cal.App.3d 1271, 1289, 261 Cal. Rptr. 204.) Substantial evidence is evidence of ponderable legal significance. (Toyota Motor Sales U.S.A., Inc. v. Superior Court (1990) 220 Cal.App.3d 864, 871, 269 Cal.Rptr. 647; Bowers, supra, at p. 873, 197 Cal.Rptr. 925.)
There is no substantial evidence to sustain the court's findings. Ramirez was clear in expressing her wishes to the court, to Dr. Spar and to the probate investigator: she wanted her son to continue caring for her as he had done for a long time. She clearly expressed to Dr. Spar her desire that her son continue to manage her property as he long had done. She was able to describe to Dr. Spar a considerable portion of that property. She also knew what estate division she had effected via the trust and had a reason for it. This was her decision. Her son had not pressured her in any way. This is clear evidence that Ramirez knew what she was doing when she gave appellant the two powers of attorney and signed the trust agreement.
To be sure, Freedman-Harvey reached a different conclusion. Ramirez's ability to communicate with Dr. Spar stands in such stark contrast to her lack of communication with Freedman-Harvey, however, as to cast substantial doubt on the validity of Freedman-Harvey's conclusions. It is highly doubtful that Ramirez's cognitive awareness and ability to communicate had improved so dramatically in the 10 days between Freedman-Harvey's interview with her and that of Dr. Spar. It is far more likely that she felt uncomfortable with Freedman-Harvey and comfortable with Dr. Spar.
Given that Ramirez's present wishes so closely coincided with her actions in 1997 in executing the trust and the powers of attorney, Dr. Spar preferred that appellant act under the powers of attorney and the trust agreement rather than have a conservator appointed. In his opinion, this would best serve Ramirez's interests.
Freedman-Harvey and Ellman disagreed. In their view, the only hope of ending the conflict between appellant and Canizales was to use neutral strangers as conservators who would impose firm limits and confine the children to their familial roles only.
Freedman-Harvey's position was based on his extremely low low opinion of Ramirez's cognitive ability and awareness, however, as well as the benefits she would derive from a conflict-free environment. As noted above, the opinion is open to very serious doubt.
Ellman's focus was solely on the difficulty in retaining caregivers due to the tension in the family. She testified that she and Gladstone ultimately had limited the children to visiting on alternate days and instructed them to leave care of their mother to the caregivers. She did not testify, however, that these steps had been effective in removing the tension from Ramirez's home or in ameliorating the conflict between the children. It is doubtful that they would be effective, given the distrust appellant and Canizales have for each other.
It is noteworthy also that Cohen, the counselor who interviewed appellant and Canizales, found Canizales's motives to be less than pure while appellant was sincerely motivated to serve his mother's best interests. To be sure, appellant had shown poor judgment on some occasions. Guidance through court order would obviate that problem, however.
There is no evidence that appellant ever did anything but take good care of Ramirez *590 and substantial evidence that he did care for her well. There is no evidence that he mismanaged her estate. Indeed, Knopf, the retired probate attorney, found no fault with his administration of the trust assets. In Knopfs opinion, given the degree to which Ramirez trusts appellant's property management, introducing a stranger to manage the property now would not be in Ramirez's best interests.
In the face of this evidence, it is difficult to understand why the court did not appoint appellant conservator. Notwithstanding the conflict between appellant and Canizales, it clearly was in Ramirez's best emotional and financial interests that the court do so. Through the orders it can fashion and enforce, it is more readily within the court's power to reduce that conflict to manageable proportions than it would be within the power of the temporary conservators. Not only are the court's findings not supported by substantial evidence, but this case exemplifies the wisdom underlying Probate Code section 1810. Here a competent, caring family member willing to serve was nominated, and yet the court appointed a professional conservator. This was a clear abuse of discretion.
The order is reversed. The superior court is directed to enter a new and different order appointing appellant conservator of Ramirez's person and estate. In conjunction therewith, the court is directed to enter orders setting a visitation schedule that allows each child visitation free from the other child's interference, prohibiting Canizales from harassing appellant by repeatedly calling in various agencies, and any other orders the court deems appropriate for case management. Appellant is to recover costs on appeal.
MIRIAM A. VOGEL, J., and MALLANO, J., concur.
NOTES
[1] We likewise express no opinion as to its validity.