[No. D048591. Fourth Dist., Div. One. Mar. 13, 2007.]

Conservatorship of the Person of AMANDA B.;
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Petitioner and Respondent, v.
AMANDA B., Objector and Appellant.

## COUNSEL

Christopher Blake, under appointment by the Court of Appeal, for Objector and Appellant.

John J. Sansone, County Counsel, and Leonard W. Pollard II, Deputy County Counsel, for Petitioner and Respondent.

## OPINION

## AARON, J.—

### I.

### INTRODUCTION

Amanda B. appeals from a judgment establishing a conservatorship for her under the Lanterman-Petris-Short Act (LPS Act).[1] (Welf. & Inst. Code, § 5000 et seq.)[2] Amanda challenges the judgment on two grounds. Amanda first contends that the trial court's finding that she lacks the capacity to make medical decisions unrelated to her grave disability is not supported by substantial evidence. Second, Amanda asserts that the trial court erred by assigning her level of placement as a locked treatment facility *or* a board and care facility. According to Amanda, the trial court was required to determine the "least restrictive placement" appropriate for her, and that by leaving the choice of the level of placement to the discretion of the conservator, the trial court failed to carry out its duty, as required under the LPS Act.

---

[1] "The LPS Act is a comprehensive scheme designed to address a variety of circumstances in which a member of the general population may need to be evaluated or treated for different lengths of time. (§ 5150 [short-term emergency evaluation]; § 5250 [intensive 14-day treatment]; § 5300 [180-day commitment for the imminently dangerous]; § 5260 [extended commitment for the suicidal]; § 5350 [30-day temporary conservatorship or one year conservatorship for the gravely disabled].) . . . [¶] A stated purpose of the LPS Act is to provide 'prompt evaluation and treatment of persons [from the general population] with serious mental disorders.' (§ 5001, subd. (b).) . . . To achieve this purpose, a number of LPS Act provisions allow a person to be removed from the general population in order to be civilly committed based on a probable cause determination made by a mental health or law enforcement professional, and then to challenge the civil commitment within a reasonable time afterwards." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253–254 [127 Cal.Rptr.2d 177, 57 P.3d 654].)

[2] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

We conclude that substantial evidence supports the trial court's finding that Amanda is unable to make medical decisions unrelated to her grave disability. However, the trial court erred in failing to specifically designate the appropriate level of placement for Amanda. We therefore remand the case to the trial court for a determination as to the least restrictive alternative placement appropriate for Amanda.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 22, 2006, the San Diego County Health and Human Services Agency (Agency), through its Office of the Public Conservator (OPC), filed a petition to establish a conservatorship for Amanda under section 5350, part of the LPS Act.

At the time OPC filed the petition to establish a conservatorship for Amanda, she was 42 years old and homeless. She had been placed at Scripps Mercy Hospital for care.

Amanda had previously been on a conservatorship from August 2004 to November 2005. When the conservatorship expired, Amanda was released from psychiatric care. At that time, Amanda was diabetic and morbidly obese.

Amanda requested in this case that a jury determine whether she had a grave disability. The trial commenced on May 1, 2006. Dr. Ezequiel Esparza, a psychiatrist at Scripps Mercy Hospital, testified as to his assessment of Amanda, which was based on his having treated her for several weeks in February and March 2006. Dr. Esparza saw Amanda five or six times per week for 10 to 20 minutes at a time, and diagnosed her as suffering from disorganized schizophrenia. Symptoms of this type of schizophrenia include delusional thinking, and disorganized thinking and behavior. Dr. Esparza testified that while Amanda was hospitalized, she exhibited disorganized thinking and poor personal hygiene. Amanda was under a delusion that she was a Roman Catholic nun and that she had appeared in the movie Sister Act (Touchstone Pictures 1992) with Whoopi Goldberg.

Amanda's medical records indicate that she was hospitalized on at least two other occasions in 2004 and 2005. Dr. Esparza was unable to obtain an accurate history for Amanda because she could not provide reliable informa-

tion regarding her past, and no known relatives were available to assist doctors in gathering her history.

While in the hospital, Amanda complied with hospital rules and regulations. However, her recent history indicated that upon being released from a hospital setting, Amanda failed to take her medications or obtain treatment for the conditions underlying her grave disability. Dr. Esparza did not believe that Amanda was capable of appropriately managing her money or her disability funds.

Michele Clemons is a mental health specialist for San Diego County Department of Mental Health, and was Amanda's case manager during Amanda's previous conservatorship, from August 2004 to November 2005, while Amanda was placed at the Alpine Special Treatment Center, a locked treatment facility. At the time of trial, although Amanda's previous conservatorship had expired, Clemons was continuing to serve as Amanda's designated payee for Amanda's disability payments. Clemons testified about her relationship with Amanda, and discussed conversations she had had with Amanda regarding Amanda's diabetes. On several occasions when Clemons asked Amanda whether she was taking her medications and/or getting insulin shots, Amanda told Clemons that she did not have diabetes. Clemons was unable to answer the question whether Amanda still denied having diabetes because Clemons had not seen Amanda "for sometime [sic]."

Amanda testified and gave a confusing account of her childhood. She claimed that she had been kidnapped as a child and had been called Tabitha. She said that her birth certificate had been altered, including her name and birth date. Amanda indicated that she was a nun in France in 1927 with the religious name Sister Mary Bishop, that she had appeared in commercials for L'Oreal, and that her husband is the actor Kiefer Sutherland, who lives in Los Angeles because he is on a television show. When asked whether she believes she has a mental disorder, Amanda responded, "I—I believe I—I have headaches and migraines, which are normal, but I don't believe—I don't believe I have a mental disorder."

Outside the presence of the jury, Dr. Esparza offered his opinion concerning the disabilities[3] he believed the court should impose on Amanda. Dr. Esparza

---

[3] In this context, the term "disabilities" refers to the limitations a court may impose on a proposed conservatee as listed in section 5357. Examples of disabilities a court may impose include, inter alia, taking away the privilege of possessing a driver's license, limiting a conservatee's right to enter into contracts, and disqualifying a conservatee from voting.

believed Amanda could safely drive if she possessed a valid driver's license. However, he was concerned about her ability to enter into contracts. Dr. Esparza stated that he thought that Amanda was capable of making routine medical decisions unrelated to her grave disability. Dr. Esparza was not specifically asked about Amanda's diabetes or her ability to make decisions regarding treatment for it. When asked about the appropriate level of placement for Amanda, Dr. Esparza indicated that he believed Amanda could live in a board and care facility if "she's given medication, she takes it, and she is court ordered to do so . . . ."

On May 3, 2006, the jury found that Amanda was gravely disabled. On that same day, the trial court filed a document entitled "Judgment and Order After Trial By Jury," in which the court determined the disabilities to be imposed on Amanda and her appropriate level of placement. The court imposed all of the standard disabilities with the exception that Amanda retained the right to vote and to possess a driver's license. The court set Amanda's level of placement as a "Locked Facility or Board and Care."

Amanda filed a timely notice of appeal.

## III.

## DISCUSSION

A. *Substantial evidence supports the court's conclusion that Amanda is incapable of making medical decisions unrelated to her grave disability*

Amanda seeks reversal of that portion of the trial court's order granting the conservator the power to make medical decisions unrelated to her grave disability. According to Amanda, there was no substantial evidence to support the trial court's conclusion that she is incapable of making medical decisions unrelated to her grave disability.

An appellate court reviews the trial court's factual findings to determine if there is substantial evidence to support them, and will sustain the trial court's factual findings if there is substantial evidence to support those findings, even if there exists evidence to the contrary. (*Conservatorship of Isaac O.* (1987) 190 Cal.App.3d 50, 57 [235 Cal.Rptr. 133].) "In making th[e] determination [regarding substantive evidence], we view the entire record in the light most favorable to the trial court's findings. [Citations.] We must resolve all

conflicts in the evidence and draw all reasonable inferences in favor of the findings. [Citation.] Substantial evidence is evidence of ponderable legal significance. [Citations.]" (*Conservatorship of Ramirez* (2001) 90 Cal.App.4th 390, 401 [108 Cal.Rptr.2d 581].)

There is substantial evidence in the record to support the trial court's finding that Amanda is not capable of making routine medical decisions. Michele Clemons, Amanda's previous case manager, testified that between August 2004 and November 2005, she had spoken with Amanda about Amanda's diabetes several times, and Amanda "responded on several occasions that she didn't have diabetes." After Amanda's conservatorship expired in November 2005, Clemons remained in telephone contact with Amanda. Clemons received approximately six calls from Amanda between Amanda's hospitalizations in December 2005 and February 2006. During those conversations, Clemons asked Amanda about a number of things, including Amanda's diabetes. Clemons remembered that Amanda's responses to Clemons's questions regarding whether she was taking medication for her diabetes were "vague," and that sometimes Amanda told her that she was taking the medication. However, Clemons's testimony suggested that she doubted the truth of Amanda's statements, because Amanda was exhibiting signs suggesting that she was not taking her medications.[4]

Amanda testified about her diabetes at the trial. Her responses to the questions posed suggest that although she appeared to recognize that she had diabetes, she did not understand that it is a chronic illness that requires consistent treatment. Counsel for the public conservator and Amanda engaged in the following colloquy:

"Q. Do you have diabetes?

---

[4] Clemons voiced concern during questioning by the attorney for the Agency:
"Q. Were you asking her questions about whether she was taking her medication for [diabetes]?
"A. Yes.
"Q. What was her response to those types of questions?
"A. I seem to recall her being vague, or sometimes telling me, yes, she was taking them. But I was seeing signs such as her having long pauses in between answering questions. That concerned me . . . ."
Later during that line of questioning, Clemons said, "But obviously now that she's in the hospital I am getting this phone call from the social worker Darin Folk. I realize [after hearing that she was in the hospital] that she's decompensated psychiatrically. So it was my belief at that time that she was—in fact, as I thought—prior when I saw her downtown, she was off her medications; not taking them."

"A. I think I have on [*sic*]—I don't know. This is the second time I had it to where it will go away. It's a matter of taking insulin. And I never had to take the pills. The pills scare me. I don't like pills. . . . And this family does not take them. Say you are not supposed to. It's kind of scary to be on that medication. It slows you down.

"Q. Do you take medication for your—

"A. Oh, yeah, I do take it because I think it's the right thing to do right now until this is over with. I do take it."

Amanda's statements show that she was not sure whether she suffered from diabetes, and suggest that to the extent she did understand she had diabetes, she was under the impression that it might "go away." She testified that she did not like pills, and felt that "be[ing] on that medication" was "scary." Although Amanda's testimony implies that at the time of trial she was taking medication to treat her diabetes, it also indicates that she believed that the need to take the medication was temporary. She stated that taking the medication was "the right thing to do right now until this is over with." This testimony indicates that Amanda did not possess a good understanding of her medical needs. A reasonable inference is that Amanda's failure to grasp the nature of her physical condition would cloud her ability to make decisions regarding her assorted health problems, most notably her diabetes.

Additionally, Amanda's history demonstrates that when she is not under a conservatorship, she does not take her medications or seek appropriate medical care. This is an indication that she might not fully comprehend her medical needs. For example, when she was admitted to Scripps Mercy Hospital, Amanda presented with edema of her lower extremities and an abscess in her toe. After she was moved to the hospital's psychiatric unit, doctors found an abscess on her right posterior thigh. Amanda indicated that she had been bitten by a rat while she was homeless.

Amanda relies on Dr. Esparza's testimony to support her contention that the trial court's decision regarding her inability to make medical decisions is not based on substantial evidence. When asked, "In your opinion is Amanda . . . capable of making medical decisions concerning routine medical treatment unrelated to her mental disorder?" Dr. Esparza responded, "Yes." Dr. Esparza then stated that he did not believe that Amanda was capable of making medical decisions related to her mental illness because "[f]undamen-

tally her illness affects her reasoning and she does not believe that she has a mental illness."

The court acknowledged Dr. Esparza's statement that Amanda could make medical decisions unrelated to her grave disability, but chose to give more weight to the other evidence in the record. The court stated, "I understand the doctor said [Amanda] could make medical decisions outside of her mental health issue, but then I heard the testimony that she has diabetes and she has not been treating it appropriately, and not accepting that it needs to be treated appropriately." The trial court was not bound by Dr. Esparza's testimony regarding Amanda's ability to make medical decisions unrelated to her mental health, and was free to make this determination. (See *Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 509 [30 Cal.Rptr.2d 542] [" 'As a general rule, "[p]rovided the trier of fact does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted. [Citations.]" [Citation.] This rule is applied equally to expert witnesses.' [Citations.]"].)

In a report filed with the Agency's petition to establish a conservatorship for Amanda, Dr. Esparza indicated a different opinion regarding Amanda's ability to make medical decisions unrelated to her grave disability. In that document, Dr. Esparza's recommendation was that Amanda "should not . . . have the right to refuse or consent to medical treatment unrelated to the conservatee's being gr[avely] disabled . . . ."[5] Thus, Dr. Esparza himself provided conflicting evidence to the court. The court resolved the conflict in favor of giving the conservator the authority to make medical decisions for Amanda. This court should not second-guess the trial court's resolution of this evidentiary conflict: "In reviewing the evidence on appeal, all conflicts must be resolved in favor of the judgment, and all legitimate and reasonable inferences indulged in to uphold the judgment if possible. When a judgment is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the judgment. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Quintanilla v. Dunkelman* (2005) 133 Cal.App.4th 95, 113–114 [34 Cal.Rptr.3d 557].)

---

[5] The copy of the document provided to the court cuts off words at the right side of the page, so that only the letters "gr" can been seen after the phrase "unrelated to the conservatee's being" and before the word "disabled" on the next line. From context, we discern that the word cut off on the copy provided is "gravely."

The record demonstrates that there is substantial evidence to support the trial court's finding that Amanda should not be allowed to refuse or consent to routine medical treatment unrelated to her grave disability. We therefore affirm this portion of the trial court's judgment.

**B.** *The trial court's order does not meet the statutory requirement that the court select the "least restrictive placement" for the conservatee*

Amanda contends that the trial court's order is invalid because the court failed to determine the appropriate level of placement for her, as required under section 5358. On the issue of Amanda's placement, the judgment states, "The least restrictive level of placement available and necessary to achieve the purpose of treatment for Amanda . . . is a Locked Facility or Board and Care." The legislative scheme contemplates that the court, not the conservator, is to designate the "least restrictive alternative placement" appropriate for a conservatee upon the establishment of the conservatorship.

Section 5358 provides the framework for placement of a conservatee. Subdivision (a)(1)(A) of that provision, which is applicable to Amanda because she has been determined to be gravely disabled as defined in subdivision (h)(1)(A) of section 5008,[6] provides:

"(a)(1) When ordered by the court after the hearing required by this section, a conservator appointed pursuant to this chapter shall place his or her conservatee as follows:

"(A) For a conservatee who is gravely disabled, as defined in subparagraph (A) of paragraph (1) of subdivision (h) of Section 5008, in the least restrictive alternative placement, as designated by the court." (§ 5358, subd. (a)(1)(A).)

■ Thus, the court is to designate the least restrictive alternative placement for the conservatee. Section 5358, subdivision (c)(1) provides further instruction as to placement of the conservatee, and specifically identifies the court as having the responsibility to set the appropriate level of placement: "(c)(1) For a conservatee who is gravely disabled, as defined in subparagraph (A) of paragraph (1) of subdivision (h) of Section 5008, if the conservatee is

---

[6] Under section 5008, subdivision (h)(1)(A), the term "gravely disabled" means "A condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." Section 5008, subdivision (h)(1)(B) provides an alternative definition of "gravely disabled" applicable to those who have been found to be mentally incompetent under section 1370 of the Penal Code.

not to be placed in his or her own home or the home of a relative, first priority shall be to placement in a suitable facility as close as possible to his or her home or the home of a relative. For the purposes of this section, suitable facility means the least restrictive residential placement available and necessary to achieve the purpose of treatment. *At the time that the court considers the report of the officer providing conservatorship investigation specified in Section 5356, the court shall consider available placement alternatives. After considering all the evidence the court shall determine the least restrictive and most appropriate alternative placement for the conservatee.* The court shall also determine those persons to be notified of a change of placement. The fact that a person for whom conservatorship is recommended is not an inpatient shall not be construed by the court as an indication that the person does not meet the criteria of grave disability." (§ 5358, subd. (c)(1), italics added.)

█ The trial court's order as to Amanda's placement is an ambiguous designation because it indicates two different levels of care. There is nothing in the statute that suggests that the trial court's determination of the least restrictive placement may be an "either/or" designation of multiple levels of care. Rather, in discussing "*the* least restrictive alternative *placement*," the statutory scheme envisions that the court will set a single level of placement as the least restrictive placement. (§ 5358, subd. (c)(1), italics added.)

Essentially conceding that the trial court's order is erroneous, the Agency asserts that this court may correct the judgment on appeal "to comport with the record."[7] The Agency maintains that because the record shows that Amanda had been treated in a locked facility and because the conservatorship investigation report proposes that a locked treatment facility would be the least restrictive placement for Amanda, this court should interpret the judgment as simply, albeit unnecessarily, recognizing that the conservator has the authority to transfer Amanda to a board and care facility if and when she is able to function in one.

It is true that section 5358 gives conservators the discretion to move a conservatee to a less restrictive placement without the approval of the court: "Except for a conservatee who is gravely disabled, as defined in subparagraph (B) of paragraph (1) of subdivision (h) of Section 5008, the conservator may transfer his or her conservatee to a less restrictive alternative placement without a further hearing and court approval. In any case in which a conservator has reasonable cause to believe that his or her conservatee is in

---

[7] The Agency states, "If the trial court erred in placing Amanda in a 'locked facility or board and care' [citation], this Court may correct the judgment to comport with the record."

need of immediate more restrictive placement because the condition of the conservatee has so changed that the conservatee poses an immediate and substantial danger to himself or herself or others, the conservator shall have the right to place his or her conservatee in a more restrictive facility or hospital. Notwithstanding Section 5328, if the change of placement is to a placement more restrictive than the court-determined placement, the conservator shall provide written notice of the change of placement and the reason therefor to the court, the conservatee's attorney, the county patient's rights advocate and any other persons designated by the court pursuant to subdivision (c)." (§ 5358, subd. (d)(1).)

However, the fact that a conservator possesses the discretion to move the conservatee to a less restrictive placement does not eliminate the duty of the court to set the initial level of placement. The trial court in this case did not designate the level of placement, but rather, offered two options from which the conservator was to choose. It is clear that the trial court was not simply reaffirming the discretion given to the conservator to place Amanda in a less restrictive alternative placement once she no longer required the restrictions of a locked facility. The transcript of the hearing establishes that the trial court intended to delegate to the conservator the court's responsibility to make the initial designation of the least restrictive alternative placement:

"The Clerk: The only thing I need to know is where the patient is being placed. And they have given a whole bunch of—[¶] . . . [¶]

"The Court: What is the name of the place?

"Mr. Maphis: Lakeside Special Care Center.

"The Court: Is Lakeside. Well, number three says the least restrictive level of placement available and necessary.

"Mr. Short: I thought the doctor testified he thought she could not handle a board and care.

"The Court: No, I'm not making a ruling on that. I would like to see her in a board and care if it could be done and she could handle it. And that will be up to the conservator to deal with. They can get her to a board and care where she functions fine.

"Mr. Short: But it's up to the court at this particular moment.

"The Court: Well, I will authorize it. That's not the point.

"Mr. Short: Oh, okay.

"The Court: It's not for me to say. Maybe the least restrictive care would be board and care.

"Mr. Beal: Well, Your Honor—

"The Court: Under three.

"Mr. Beal: Right now she's in a locked facility. And I think number three is asking for the general type. It's not asking for where she is now. So it's asking for locked facility.

"The Court: It says least restrictive level of placement.

"Mr. Beal: So the level would be locked facility or board and care. That's a different level of placement. But we are seeking a locked facility on the basis of Dr. Esparza's testimony. And we know that's the least restrictive. "The Court: I will say locked facility or board and care and leave it to the conservator to try to work it out.

"Mr. Maphis: General.

"The Court: That's what I am saying. So I will just say the least restricted locked facility or board and care and leave it to your discretion to try to place her as best you can.

"Mr. Maphis: Okay."[8]

The trial court was incorrect in concluding, "It's not for [the court] to say," with regard to the determination of the least restrictive alternative placement. That determination is to be made by the court in the first instance, not the conservator. It was improper for the court to "leave it to the conservator to try to work it out." Because the trial court must determine the least restrictive alternative placement appropriate for a conservatee, we reverse that portion of the trial court's judgment and remand the matter for the trial court to designate the least restrictive level of placement appropriate for Amanda.

---

[8] Mr. Short was representing Amanda, Mr. Beal was representing the Agency, and it appears that Mr. Maphis is a member of OPC.

## IV.

## DISPOSITION

The judgment of the trial court is reversed insofar as it designates that the least restrictive alternative placement for Amanda is a locked facility *or* a board and care facility. The matter is remanded to the trial court to designate a single level of placement that represents the least restrictive alternative placement available and necessary to achieve the purpose of treatment for Amanda. In all other respects the judgment is affirmed.

Haller, Acting P. J., and McIntyre, J., concurred.