Filed 12/16/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| Conservatorship of the Person of B.C. | 2d Civil No. B270310 (Super. Ct. No. 56-2014-00452252-PR-CP-OXN) (Ventura County) |
| C.S.<br><br>    Petitioner and Respondent,<br><br>v.<br><br>B.C.,<br><br>    Objector and Appellant. | |

In *Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378, 381, (*Heather W.*) we held that in conservatorship proceedings under the Lanterman-Petris-Short Act (LPS Act)[1] "the trial court must obtain a personal waiver of a jury trial from the conservatee, even when the conservatee expresses no preference for jury trial." We joined a growing line of cases holding that jury waivers must be secured from individuals facing a substantial loss of personal freedom in civil

---

[1] Welfare & Institutions Code section 5000 et seq.

commitment proceedings aimed at "protecting the public and treating severely mentally ill persons."  (*Heather W.* at p. 383.)

Here, the trial court appointed respondent C.S. as probate conservator for her niece, appellant B.C., who suffered cardiac arrest and brain damage from the combined effect of methamphetamine and alcohol.  (Prob. Code, § 1800 et seq.)[2]  B.C. appeals C.S.'s appointment.

We hold that probate conservatorships do not require a personal waiver of the conservatee's right to a jury trial because the proceedings pose no threat of confinement and are conducted "according to the law and procedure relating to the trial of civil actions, including trial by jury if demanded by the proposed conservatee."  (§ 1827.)  B.C.'s attorney had authority to waive a jury trial on her behalf, even if the trial court failed to recite that B.C. had a right to a jury.  We also conclude that B.C.'s opposition to C.S.'s petition was fully litigated, satisfying a Probate Code requirement that B.C. be consulted about the proposed conservatorship.  (§ 1828, subd. (b).)  Finally, the record supports the trial court's finding that B.C. cannot take care of her own health needs, nor can her husband be trusted to do so.

## FACTS

In 2012, at age 30, B.C. overdosed and nearly died. The resulting lack of oxygen to her brain caused physical and mental impairments.  When stricken, B.C. was with Jesse M., by whom she has a daughter born in 2006.  The couple has a history of methamphetamine abuse.

---

[2] Unlabeled statutory references in this opinion are to the Probate Code.

Upon release from the hospital, B.C. lived with her mother and required 24-hour care. Initially, Jesse M. lived in the household and helped with B.C's care, but was evicted by B.C.'s mother because he objected to the administration of B.C.'s prescribed medication.

Following the sudden death of B.C.'s mother, who left B.C. a $450,000 inheritance, B.C. and Jesse M. were married, in May 2014. B.C. went to live with Jesse M., who stopped administering her medication because he felt she was more alert without it.

B.C. was evaluated by neuropsychologist Ines Monguio in August 2014. Dr. Monguio determined that B.C. can perform daily living activities, such as arising in the morning, brushing her teeth, showering, and preparing a simple meal, but needs care, direction and structure. Dr. Monguio observed that B.C. seems to trust Jesse M., yet calls him her "best friend," not her husband, and does not know his home address.

Testing showed that B.C. processes information very slowly and has little ability to remember anything. Dr. Monguio doubted whether practice would improve this severe memory deficit. B.C. is not competent to make medical decisions and needs assistance with her physical health as she "doesn't have the memory to remember from one moment to the next, much less one day to the next." The memory deficit makes B.C. "vulnerable to fraud from people she trusts."

Dr. Monguio opined that Jesse M. is dedicated to B.C.'s well-being, but acknowledged that (1) Jesse M. did not hire a speech and occupational therapist, as Dr. Monguio

3

recommended, though money is set aside for B.C.'s medical needs, and (2) Jesse M. admitted that he and B.C. "were partying together," using drugs and alcohol, when B.C. had her near-fatal heart attack. Dr. Monguio could not say whether Jesse M. felt guilty about the event.

In March 2014, B.C. signed a Durable Power of Attorney For Health Care naming Jesse M. as her agent. Jesse M. obtained the form and had B.C. sign it before a notary. Dr. Monguio did not know whether B.C. is able to appreciate the risks, benefits or alternatives to naming Jesse M.

During Dr. Monguio's second evaluation in October 2015, B.C. seemed more relaxed, fluent and pleasant than before, though she did not remember Dr. Monguio. B.C. expressed love for Jesse M. and her life. Test results showed no meaningful cognitive changes. B.C. was consistent in 2014 and 2015 that she wanted Jesse M. to make medical decisions and assist her. Dr. Monguio observed that B.C. "lost a significant amount of weight" over the year.

B.C.'s estate conservator testified that Jesse M. took disability benefits that were supposed to be in B.C.'s estate and refused to return the money. Jesse M. admitted at trial that B.C. received $14,000 in disability benefits. He spent all of it on a road trip, jewelry and "a whole new wardrobe" as "to [his] knowledge, it had nothing to do with the [conservatorship] estate or anything else." He works at a liquor store and lives at his mother's house with B.C. and their daughter. Jesse M. has a busy schedule, with four children from a prior relationship and his daughter with B.C., plus he sometimes takes B.C. to visit her 12-year-old son (who lives with B.C.'s ex-husband).

4

Jesse M. did not hire a speech or occupational therapist because it is expensive and "it might not even work" to help B.C. He was told that an occupational therapist could be secured for B.C. through insurance, to reduce the expense. Jesse M. dropped the idea of therapy when MRI and EEG tests showed normal results. He did not pursue treatment at a nearby brain injury center suggested by B.C.'s doctor, and contended that the onus is on B.C.'s doctors to make referral appointments. Over a year later, he is still waiting for the doctors to call and tell him where and when to take B.C. for treatment. He admitted fault for not always taking B.C. to follow-up appointments with her doctors.

Jesse M. has not taken advantage of free or low-cost programs for brain-injured individuals, saying "I'm more than open if anybody else contacted them, family or anything, to take their advice or opinions." B.C. is in charge of her daily plans. This means being with family, but not "throwing thousands of dollars" on medical treatments that might not help. Jesse M. noted that B.C. lost "a lot" of weight recently. He attributed it to exercise or depression, not drug abuse. He did not bring her medical records to the trial court, though they were subpoenaed.

PROCEDURAL HISTORY

C.S. petitioned for appointment as probate conservator in April 2014, on the grounds that her niece B.C. is unable to properly care for her physical health, be employed or manage her financial resources, and is susceptible to undue influence owing to her brain injuries. Through private counsel,

5

B.C., newly married to Jesse M., who participated in hiring and advising the attorney, opposed the petition. She asserted that she is capable of making her own decisions, financial or otherwise. In light of B.C.'s alleged incapacity to make decisions, including the decision to hire a lawyer, the trial court appointed the Ventura County Public Defender to represent B.C., without interference by others.

The parties agreed to the appointment of a professional conservator for B.C.'s estate. The estate conservator asked the court to order Jesse M. to pay B.C.'s estate $30,000, to reimburse B.C. for Social Security disability benefits that should have been deposited into the estate, which Jesse M. had instead diverted to himself. The conservator, who was unsure how much of B.C.'s disability benefits Jesse M. received, conceded the futility of pursuing recovery from Jesse M., who has no assets and is responsible for five children.

THE TRIAL COURT'S RULING

A bench trial was conducted on the proposed conservatorship of B.C.'s person. In December 2015, the court appointed C.S., finding that B.C. is unable to provide for her physical health, food, clothing or shelter, and this is the least restrictive alternative needed for B.C.'s protection; further, B.C. lacks capacity to give informed consent for medical treatment. From the bench, the court observed that Jesse M. "doesn't have the capability to be a decision maker with his wife" as he is overburdened and needs guidance. The court prohibited any change in B.C.'s placement without court approval. B.C. appealed the appointment.

6

POST-JUDGMENT EVIDENCE[3]

C.S. asked the court to remove B.C. from Jesse M.'s residence.  B.C. had rapid weight loss and tested positive for amphetamine.  Noting that B.C. had a noticeable "weight loss and gaunt appearance" compared to prior court appearances, the court ordered B.C. to undergo hair follicle drug testing.  Drug tests in early 2016 show increasing levels of amphetamine and methamphetamine in B.C.'s hair.

## DISCUSSION

### 1.  Appeal and Review

The order granting letters of conservatorship is appealable.  (§ 1301, subd. (a).)  To determine if the order is supported by substantial evidence, we review the record in the light most favorable to the trial court's findings, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the judgment.  (*Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 347-348; *Conservatorship of Ramirez* (2001) 90 Cal.App.4th 390, 401.)  The testimony of one witness may be sufficient to support the findings.  (*Conservatorship of Carol K.*

---

[3] Before argument, we notified the parties of our intent to take judicial notice of evidence in the record on appeal showing that B.C. was continuing to use methamphetamine while living with Jesse M.  The parties submitted letter briefs in response to our notice. (Evid. Code, § 459, subd. (d).)  B.C.'s drug abuse while in Jesse's care is "a matter . . . of substantial consequence to the determination of the action."  (Evid. Code, §§ 459, subd. (d), 452, subd. (c); *Conservatorship of Pamela J.* (2005) 133 Cal.App.4th 807, 814-815 [taking judicial notice of documents reflecting events occurring after judgment].)  Methamphetamine use poses a grave danger to B.C.'s life, an exceptional circumstance warranting our consideration of this evidence.

(2010) 188 Cal.App.4th 123, 134.)  Procedural due process issues are subject to our independent review.  (*Conservatorship of Tian L.* (2007) 149 Cal.App.4th 1022, 1028.)

*2.  Jury Waiver*

B.C. hired private counsel, who demanded a jury trial.  The court struck the demand for a jury when it appointed the public defender, to enable B.C.'s new attorney to consult with B.C. and decide whether to demand a jury trial.  The public defender did not renew the demand.  The matter was tried by the court, which neither orally advised B.C. of a right to a jury trial nor obtained a personal waiver.  B.C. contends that the court's failure to obtain the personal waiver is reversible error, as a matter of law.

We underscore that this case involves a *probate* conservatorship.[4]  The Probate Code authorizes appointment of a "conservator of the person" if clear and convincing evidence shows that the conservatee cannot provide properly for physical health, food, clothing or shelter needs; a "conservator of the estate" may be appointed if the conservatee is substantially unable to manage financial resources, or resist fraud or undue influence.  (§ 1801.)  A probate conservatorship does not contemplate involuntary commitment.  (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 144.)

Once a petition is filed, the court clerk issues a citation directed to the proposed conservatee, setting forth the time and place of the hearing; the appropriate legal standards;

---

[4] The notice of appeal purports to be taken from an "order establishing [a] conservatorship under Welfare and Inst. Code § 5350 et seq.," i.e., the LPS Act.  The LPS Act and the Welfare and Institutions Code are inapplicable to this case.

8

the possible effects of the adjudication; the proposed conservatee's right to appear, to have legal counsel, and "the right to a jury trial if desired." (§ 1823.) B.C. does not claim that the court clerk failed to issue the required citation; she responded to it by filing opposition papers.

The probate conservatorship proceeding is conducted under the law and procedure relating to civil actions, "including trial by jury if demanded by the proposed conservatee." (§ 1827.) Neither B.C nor her appointed counsel demanded a jury.

B.C. maintains that a jury trial cannot be forfeited by mere inaction and that something more—an express waiver—is required. She relies upon the involuntary commitment statutes recently addressed by this Court in *Heather W.*, *supra*, 245 Cal.App.4th 378, a case arising under the LPS Act, which authorizes physical restraint to protect the public and treat persons gravely disabled by a mental disorder. "An LPS commitment order involves a loss of liberty by the conservatee. Consequently, it follows that a trial court must obtain a waiver of the right to a jury trial from the person who is subject to an LPS commitment." (*Id.* at p. 383.)

The petition here did not contemplate B.C.'s involuntary commitment. A probate conservator has no power to place the conservatee in a locked facility, against the will of the conservatee. (§ 2356, subd. (a); *People v. Karriker* (2007) 149 Cal.App.4th 763, 780; *Michelle K. v. Superior Court* (2013) 221 Cal.App.4th 409, 425, fn. 3.) A probate conservatorship is distinguishable from the involuntary LPS commitment discussed in *Heather W.*, *supra*, 245 Cal.App.4th 378. It is also distinguishable from the involuntary commitment of a mentally disordered offender (*People v. Blackburn* (2015) 61 Cal.4th 1113)

9

and from an involuntary hospital commitment when a defendant pleads guilty by reason of insanity (*People v. Tran* (2015) 61 Cal.4th 1160).  In those cases, the person facing commitment had to personally waive the right to a jury trial.

B.C. correctly notes that the trial judge failed to recite,  in open court, B.C.'s right "to have the matter of the establishment of the conservatorship tried by jury." (§ 1828, subd. (a)(6).)  The Probate Code does not require a jury trial or an express waiver of a jury, in stark contrast to Penal Code provisions stating that "trial shall be by jury unless waived by both the person" and the prosecutor in civil commitment cases. (Pen. Code, §§ 1026.5, subd. (b)(4), 2972, subd. (a); see *People v. Blackburn, supra,* 61 Cal.4th at pp. 1124-1125; *People v. Tran,, supra*, 61 Cal.4th at p. 1163.)  Instead, the Probate Code requires the conservatee to affirmatively demand a jury.  (§ 1827.)

Although the trial court erred by failing to advise B.C. of her right to a jury trial, the error was harmless because B.C. was represented by counsel.  "[C]ounsel has authority to bind the client in virtually all aspects of litigation, including waiver of the state constitutional right to a jury trial" in ordinary civil actions.  (*People v. Blackburn, supra,* 61 Cal.4th at p. 1124.)  There is no basis for departing from the general rule unless there is a threat of civil commitment in a special proceeding.  (*Ibid.*)  Absent a threat to B.C.'s constitutionally-protected liberty interests and absent a statutory requirement that B.C. personally waive the right to a jury, B.C.'s attorney had authority to forego a jury trial without B.C.'s express waiver in open court. (*Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 270-272.)

*3. The Court Satisfied Probate Conservatorship Requirements*

B.C. complains that the trial court did not consult with her about respondent's appointment as conservator. "[T]he court shall consult the proposed conservatee to determine [her] opinion concerning . . . [t]he establishment of the conservatorship [and] [t]he appointment of the proposed conservator." (§ 1828, subd. (b).)

B.C. was involved in each step of this proceeding. First, she hired an attorney to oppose the conservatorship petition; next, the court appointed counsel for her; and B.C. participated in the hearings, but chose not to testify. As expressed by her attorney during a vigorously contested proceeding, B.C. wanted Jesse M. to make health decisions for her. The trial was an attempt to convince the court to follow B.C.'s opinion opposing the conservatorship. B.C. was not deprived of her right to be consulted. (Compare *Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 610 [a court may not accept a stipulated judgment by counsel to establish a conservatorship without consulting the proposed conservatee].) On the contrary, B.C.'s sentiments were fully represented to the court by her attorney.

*4. Substantial Evidence Supports the Ruling*

The court may grant a conservatorship of the person if it "is the least restrictive alternative needed for the protection of the conservatee." (§ 1800.3, subd. (b).) The court made an express finding on this point. B.C. now argues that the finding is unsupported by the record. She maintains that Jesse M. is able to carry out her needs for assistance with health issues.

The record shows that Jesse M. ignored medical recommendations to obtain occupational and speech therapy for

11

B.C. and to seek free or low cost treatment at centers specializing in brain injury. He called one therapist, decided that it was too expensive, then gave up on the idea, reasoning that it was a waste of money because it *might not* improve B.C.'s cognitive and verbal skills. Jesse M.'s speculative musings caused B.C. to lose precious time without focused treatment. Jesse M. testified that the onus is on everybody but him (doctors, other family members) to seek therapy and treatment for B.C.

While Jesse M. expressed concern over the cost of B.C.'s treatment, he had no compunctions about taking B.C.'s disability benefits, which rightfully belonged to the conservatorship estate. Instead of using the money to address B.C.'s disabilities, he expended the entire sum on travel, jewelry and an entire wardrobe. Jesse M.'s poor judgment in taking and misusing B.C.'s disability benefits supports the trial court's determination that Jesse M. cannot be trusted to make suitable health care decisions for B.C.

A far greater concern to this court is evidence that Jesse M. allowed B.C. to become re-addicted to methamphetamine while in his care. It is unclear who supplied B.C. with the drugs that nearly killed her in 2012, or who is supplying her now. It is enough to know that from December 2015 through February 2016, drug tests proved that B.C. is using ever-increasing amounts of methamphetamine. With his own admitted history of methamphetamine abuse, Jesse M. is not a candidate for keeping B.C. away from drugs. A conservatorship of the person to ensure that B.C. continues to test for drugs and achieves sobriety is the least restrictive alternative.

The record shows that B.C.'s memory is so impaired that she cannot remember things "from one moment to the next,

12

much less one day to the next," according to Dr. Monguio. Although B.C. can perform simple activities, she needs care, direction and structure for everything. For this reason, Dr. Monguio considered B.C. to be in need of assistance in matters of personal health. Nevertheless, B.C. insists that she has sufficient capacity to nominate her own conservator, Jesse M.; however, Jesse M. never sought to be named as personal conservator.[5] Given B.C.'s continuing struggles with drug addiction and use of methamphetamine while living with Jesse M., any notion of naming him as personal conservator must be rejected.

DISPOSITION

The judgment granting letters of conservatorship to respondent C.S. is affirmed.

CERTIFIED FOR PUBLICATION.

PERREN, J.

We concur:

GILBERT, P. J.

TANGEMAN, J.

---

[5] B.C.'s opening brief states, "there was no evidence upon which the trial court could conclude that it was in B.C.'s best interest to have her aunt, C.S., appointed as conservator, rather than her husband, Jesse," noting that a spouse is preferred over others as conservator. (§ 1812, subd. (b).)

13

Glen M. Reiser, Judge
Superior Court County of Ventura
_____


        The Law Office of Theresa L. McConville and Sara J. McLemen for Petitioner and Respondent.

        Stephen P. Lipson, Public Defender and Benjamin W. Maserang, Sr. Deputy Public Defender, for Objector and Appellant.