Filed 10/21/13  Conservatorship of Lisa S. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| Conservatorship of the Person of LISA S. | D063826 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Petitioner and Respondent, | (Super. Ct. No. MH108236) |
| v. | |
| LISA S., | |
| Objector and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joseph P. Brannigan, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Objector and Appellant.

Thomas E. Montgomery, County Counsel, and George Seikaly and Christina I. Vilaseca, Deputy County Counsel, for Petitioner and Respondent.

After determining Lisa S.'s mental illness rendered her gravely disabled under the Lanterman-Petris-Short Act (the LPS Act) (Welf. & Inst. Code, § 5000 et seq.; all statutory references herein are to this code), the trial court imposed a one-year conservatorship over her

and further determined the least restrictive level of placement for her was a closed, locked treatment facility. At a rehearing about two months later, the court concluded Lisa failed to carry her burden of establishing she was no longer gravely disabled or that a less restrictive level of placement was warranted. Lisa contends the court's determination was not supported by substantial evidence. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Lisa's Mental Health History and Conservatorship*

Lisa is a 52-year-old woman with a history of mental illness beginning in her late 30's or early 40's. She has not lived independently for the past five or six years. Since May 2007, Lisa has undergone at least 18 acute psychiatric hospitalizations in San Diego County, and an additional seven hospitalizations in other jurisdictions. Most recently, in November 2012, Lisa was admitted to Tri-City Medical Center's Behavioral Health Unit (Tri-City) after she called the sheriff's department and reported that she was assaulted and had not taken her medications in three days.

At the hospital, Lisa was diagnosed with schizoaffective disorder, bipolar type. She was delusional and tangential, accusing the police of sexually molesting her and telling stories of having been beaten up by two black workers and placed in a hospital where she was tortured. During her medical examination, Lisa denied being herself and denied that her parents were her parents. Medical staff observed that she had severe, debilitating delusional thoughts, was perseverative, and had limited insight and judgment. Based on her delusional state, multiple prior hospitalizations, and lack of a plan to provide for her basic needs, Tri-City medical staff referred Lisa for a conservatorship investigation. The referral stated that Lisa "has had

2

multiple admissions and when she leaves the hospital she ends up in another one . . . and she stops her medications."

In December 2012, the Office of the Public Conservator commenced conservatorship proceedings under the LPS Act. At a January 2013 hearing, the trial court found beyond a reasonable doubt that Lisa was gravely disabled and that the least restrictive placement for her was a closed, locked treatment facility. The court established a one-year LPS conservatorship for Lisa and she was placed at Alpine Special Treatment Center (Alpine), where she remains to date.

*The Rehearing*

About two months after the initial hearing, Lisa filed a request for rehearing under section 4364 to contest her LPS conservatorship and level of placement. In connection with the request, Alma Carpio, Psy.D., conducted a court-ordered forensic examination of Lisa on the morning of the rehearing. Dr. Carpio and Lisa were the only witnesses who testified at the rehearing.

Dr. Carpio diagnosed Lisa with schizoaffective disorder, bipolar type, and opined that Lisa remained unable to provide for her food, clothing, or shelter. In support of her conclusion, Dr. Carpio cited Lisa's extensive history of hospitalization and "pattern of doing well after a psychiatric hospitalization in a contained environment and compliant with medications initially and then eventually decompsat[ing] because she stops her treatment." She explained that Lisa had been hospitalized in early 2012 after she became noncompliant with her medications, and again in late 2012 in the incident that led to her conservatorship.

3

Despite this history, Lisa had told Dr. Carpio during the forensic examination that she had never been noncompliant with medication.

Dr. Carpio testified that she observed Lisa to have disorganized thoughts, rambling speech, and provided answers that were irrelevant to the questions asked of her. Dr. Carpio also described Lisa as having delusional and paranoid thoughts and poor insight into the severity of her mental illness. With regard to the paranoia, Dr. Carpio explained that Lisa stated her psychiatrist at Alpine was keeping her there against her will for his own financial gain and to punish Lisa.

One manifestation of Lisa's disorganized thought process was her inability to remember all the medications she takes, though she could remember some. Another manifestation was Lisa's proposed plan for living independently. She proposed to live at the Fallbrook Country Inn, claiming to have lived there the month before she was admitted to Alpine. But Dr. Carpio explained that claim was contradicted by Lisa's medical history, which indicated that she had not lived on her own for the last five years. Dr. Carpio concluded Lisa remained gravely disabled and the least restrictive placement remained a closed, locked treatment facility.

Lisa testified that she is aware that she is bipolar, but characterized the condition as mood swings that were exacerbated after her former roommate poisoned her with lithium concealed in beef stroganoff noodles. She acknowledged she had been hospitalized numerous times, but asserted that she had not "really been in . . . psychiatric much." Rather, she attributed her hospitalizations to her father getting upset and calling the police. Lisa also testified that one of the doctors at Tri-City only opined she was gravely disabled for his own financial gain.

4

Lisa identified many of the medications she was prescribed, but claimed that the Tri-City doctor only prescribed one of the medications because he had a financial stake in the pharmaceutical manufacturer. Lisa maintained she had never been noncompliant with her medication, with one possible exception when she asserts the label on the medication had another patient's name on it. Lisa testified that if she were released from Alpine, she would live on her own at Fallbrook Country Inn, resume seeing her private psychiatrist, and follow his advice regarding medications.

The court acknowledged the conflicting testimony regarding the suitability of Lisa's proposed living plan and her history of noncompliance with prescribed medications. The court also remarked on Lisa's numerous hospitalizations and the fact she had not lived on her own for many years. The court found beyond a reasonable doubt that Lisa remained gravely disabled and ordered that she remain in a closed, locked treatment facility.

A week after the hearing, Dr. Carpio filed a report documenting the findings of her examination of Lisa. Because the report was not before the court at the rehearing, we have not considered it.

## DISCUSSION

### I. *General Legal Principles*

The LPS Act governs involuntary treatment of the mentally ill in California. (§ 5001.) A court may place a person under conservatorship for up to one year where she is gravely disabled and unwilling or unable to accept voluntary treatment. (§ 5350.) One is gravely disabled if she is presently unable to provide food, clothing, or shelter for herself. (§ 5008, subd. (h)(1)(A); *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15, 18.) In proceedings to

5

appoint a conservator, the proposed conservatee is entitled to a trial by jury at which the petitioner bears the burden of proving beyond a reasonable doubt that the proposed conservatee is gravely disabled. (*Baber v. Superior Court* (1980) 113 Cal.App.3d 955, 966 (*Baber*).) Once established, a conservatorship lasts for one year (subject to subsequent reappointment proceedings). (*Id*. at p. 960; § 5361.)

During the one-year conservatorship, the conservatee may petition for a rehearing. (§ 5364.) "In a petition for rehearing, the conservatee carries the burden of producing evidence and proving by a preponderance of that evidence that [she] is no longer gravely disabled." (*Conservatorship of Everette M*. (1990) 219 Cal.App.3d 1567, 1572.) In other words, the conservatee must prove that "since the prior establishment . . . of the conservatorship, the conservatee's situation has changed so that [she] is no longer gravely disabled." (*Baber*, *supra*, 113 Cal.App.3d at p. 966.) The conservatee is not entitled to a jury trial on her petition for rehearing. (*Ibid*.)

We review a conservatee's challenge to the sufficiency of evidence supporting a court's ruling on a rehearing under the substantial evidence standard of review. (*Conservatorship of Amanda B*. (2007) 149 Cal.App.4th 342, 347-348.) Evidence is substantial where it is reasonable, credible, and of solid value such that a reasonable trier of fact could find the conservatee gravely disabled. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577.) The testimony of a single witness, or circumstantial evidence and the reasonable inferences drawn therefrom, may be sufficient to support such a finding. (*Ibid*.; *Conservatorship of Carol K*. (2010) 188 Cal.App.4th 123, 134.) We resolve all conflicts and

6

draw all reasonable inferences in favor of upholding the judgment, if possible. (*Conservatorship of Amanda B*., *supra*, 149 Cal.App.4th at p. 350.)

## II. *Sufficiency of the Evidence*

Lisa contends substantial evidence did not support the trial court's determination that she remained gravely disabled and that the least restrictive placement was a closed, locked treatment facility. We disagree.

We are unpersuaded by Lisa's assertion that "[s]he knew she had a mental illness that required medication" and that she "consistently took her medication" while institutionalized at Alpine. While Lisa may be *aware* that she is mentally ill, substantial evidence establishes she lacks the *insight* into her mental illness required to remove her grave disability. (*Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446-447; *Conservatorship of Walker*, *supra*, 206 Cal.App.3d at p. 1577.) For example, although Lisa is aware she has been diagnosed as bipolar, her insight into that condition is that it is mere mood swings brought on by lithium poisoning and that her prior hospitalizations were the result of *her father's* mood swings, not her own. Moreover, Lisa trivialized her 20-plus prior psychiatric hospitalizations, claiming she had not "really been in . . . psychiatric much."

Lisa's compliance with medication while institutionalized at Alpine is inadequate reassurance that she would remain compliant absent a conservatorship. Dr. Carpio testified to Lisa's "pattern of doing well after a psychiatric hospitalization in a contained environment and compliant with medications initially and then eventually decompsat[ing] because she stops her treatment." (See, e.g., *Conservatorship of Walker*, *supra*, 206 Cal.App.3d at p. 1577 ["Indeed, the fact that appellant had been gravely disabled and committed in 1986 was evidence which

the court could consider that appellant did *not* take his medication on a voluntary basis."].)

Further, while Lisa was able to identify *most* of the medications she was prescribed, she was unable to identify *all* of them.

Lisa's proposed living arrangements were also insufficient to establish that she was no longer gravely disabled. While Lisa maintained she had made arrangements to live at the hotel where she claimed she had been living the month before being admitted to Alpine, Dr. Carpio testified that Lisa's patient history established Lisa had not, in fact, lived there.

DISPOSITION

The judgment is affirmed.

McINTYRE, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.

8