Filed 8/8/22 Conservatorship and Estate of J.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| Conservatorship of the Person and Estate of J.R. | C094531 |
| AMADOR COUNTY PUBLIC CONSERVATOR, Petitioner and Respondent, v. J.R., Objector and Appellant. | (Super. Ct. No. 20MH0413) |

J.R. appeals from an order issued after a bench trial appointing a conservator over her person and estate under the Lanterman-Petris-Short Act (LPS Act) pursuant to Welfare & Institutions Code section 5000 et seq.[1] J.R. contends that the order should be reversed because the trial court did not obtain her personal waiver of the right to a jury

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

trial but only accepted her counsel's statement to that effect. J.R. also contends that the order imposed special disabilities that were not supported by substantial evidence. We disagree and will affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 3, 2020, the Amador County Public Conservator (Public Conservator) filed a petition for temporary conservatorship of J.R., alleging that, as a result of a mental disorder (schizophrenia), a history of anxiety disorder, and medication noncompliance, J.R. was gravely disabled as defined in section 5008, subdivision (h), and unwilling or incapable of accepting treatment voluntarily.

The next day the trial court issued a temporary conservatorship order and appointed legal counsel to represent J.R.

On November 13, 2020, the trial court held a hearing at which counsel for J.R. stated she wanted to contest the conservatorship. Counsel informed the court that "we have had some discussions with regard to the jury trial or court trial," but "I need to have one more conversation with her." Counsel suggested that the trial be set out far enough for this conversation to occur or that the parties come back for trial setting in a week or two. The court inquired if it would be helpful for counsel to confer with J.R. now so that the trial date could be set. Counsel responded: "[W]e talked earlier today. And we can go ahead and set the date today. That is fine. I am going to err on the side of a jury trial. And then I will have that conversation with [J.R.] again and I can always pull that." The court agreed that "it would be good to set the date so that we have something to look forward to." Counsel for J.R. addressed J.R. (who was attending by Zoom): "[W]e are going to set the date for a trial for the conservatorship that we are contesting. All right?" J.R. responded: "The sooner the better."

The court said that the trial could be set for 30 days hence. J.R. responded, "I want to be at home for Thanksgiving, the holidays." The court said: "Well, we have to

2

set this for the trial, ma'am. And we have to get a jury to hear this. So we will do our best." J.R.'s response was: "Okay. I'm sure you will."

After discussion of possible trial dates, J.R.'s counsel proposed December 28 and counsel for the Public Conservator agreed. J.R. inquired "where [will I] be in the meantime?" When informed that she would remain in her current facility, J.R. said, "I am not happy here." Counsel for J.R. told her he would address her placement separately and confirmed that the trial date was December 28. J.R. asked: "From here to the 28th? I am going to spend Christmas here?" She rejected counsel's suggestion that there was time to "work all the logistics out" and said, "You have got to be kidding me."

The court observed: "That is why I wanted to give you [J.R.'s counsel] a chance to maybe speak with her. Because if she didn't want a jury trial, we might be able to advance it." The court cleared the courtroom to allow counsel to confer with J.R. Back on the record, counsel confirmed that he had talked with J.R. and said, "we are going to go ahead and waive jury and set a court trial." After further conference between the court and counsel for the parties, the court set the trial for December 14.

On December 14, 2020, the trial court conducted a trial on the petition to appoint a conservator for J.R. under the LPS Act.

Amber Peters, a deputy public conservator with Amador County, testified that J.R. had come to Peters's office to discuss the conservatorship process. After J.R. left the office, she got in a car accident. Following the accident, J.R. ended up in Sutter Amador Hospital on a section 5150 hold.[2]

---

[2] " 'Sections 5150 and 5151 permit a person to be taken into custody and detained for 72 hours when there is probable cause he or she is a danger to himself or others as a result of a mental disorder. [Citation.]' [Citation.]" (*Folsom Police Dept. v. M.C.* (2021) 69 Cal.App.5th 1052, 1057.)

Peters testified that years ago J.R. had more family support. Since 2013, life had become more difficult for J.R. She was evicted four times and had become homeless. J.R. would stabilize for a short time but then would not take her medications and end up in the hospital. Reports that Peters collected from the county behavioral health department, as well as hospitals, indicated that J.R. had a history of disorganized thoughts and anxiety, as well as a schizoaffective bipolar diagnosis. J.R. had never taken medication long enough to formulate appropriate goals to take care of herself. J.R. also had interpersonal conflicts with roommates. The last three people J.R. lived with obtained restraining orders against her.

Peters testified that initially during the temporary conservatorship, J.R. was completely resistant to taking medications. But after J.R. was assessed by a doctor (at her own request), she became more compliant. The biggest "hoop for [J.R.] to jump through" was accepting her medications and taking them. If J.R. could do that, Peters testified, some support systems could be put in place for her and she could be independent again.

Peters addressed the reasons for the specific restrictions recommended in the conservatorship order. Peters recommended that J.R. not have a driver's license, because, due to her disorganized thinking and anxiety, J.R. had trouble slowing down and recognizing her surroundings. Peters also recommended that J.R. not enter into contracts or transactions in excess of $50. Peters felt J.R. often gave money to the wrong people and entered into contracts that were unwise.

While J.R. "paid her bills and things of that nature fairly well," in the last year, several times J.R. had given her sister large sums of money to send to a man in Africa.[3] J.R.'s sister asked her for money often.

---

[3] Peters described J.R.'s relationship with her sister as "rough." There was a restraining order in place between them. When J.R. was first placed at a facility in the temporary

4

Peters recommended that J.R. not be allowed to refuse or consent to medical treatment, including routine treatment unrelated to her grave disability. Peters felt strongly about this recommendation because J.R. was well under 100 pounds when the Public Conservator first got involved with her. When J.R. came to them, she apparently needed oral surgery, which is what kept her from eating, but J.R. was not stable enough to have the surgery. J.R. also had a lot of physical ailments that needed to be addressed. Refusing medications was affecting every part of J.R.'s life, physically, mentally, socially and legally.

Dr. Jabeen Hayat, a clinical psychiatrist, testified as an expert witness. Dr. Hayat interviewed J.R. and reviewed two evaluations in which J.R. was diagnosed with schizophrenia and schizoaffective disorder. Dr. Hayat's conclusion, based on J.R.'s previous history and current presentation, was that J.R. fit more into the schizophrenia diagnosis. Schizophrenia is a psychotic disorder where the patient may have a combination of delusions, hallucinations, and disorganized thought. Dr. Hayat observed these symptoms in J.R. J.R.'s thought process was disjointed, distracted and scattered. She could not maintain a linear conversation. When asked a question, she would respond about something else. J.R. had delusions of grandeur. J.R. was also underweight and malnourished.

J.R. was taking numerous antipsychotic medications. J.R. reported that when she takes her medications, she does well. J.R. was on medication when Dr. Hayat evaluated her, but Dr. Hayat noticed in J.R.'s records that there were periods during which J.R. was missing appointments and not taking her medications. J.R. did not believe she had a

---

conservatorship, J.R. had frequent telephone calls with her sister where J.R. was yelling, screaming and disrupting the facility. When Peters limited the calls, J.R.'s anxiety level decreased. Peters testified she would not recommend J.R.'s sister as someone to provide support for J.R.

psychiatric illness. Dr. Hayat concluded that suffering from schizophrenia hindered J.R.'s ability to understand what kind of physical care she needed.[4]

Dr. Hayat concluded that J.R. needed help and support. When left on her own, J.R. denied her illness and canceled appointments. Dr. Hayat recommended the highest level of care.

J.R. testified regarding her ability to feed, clothe, and shelter herself, and her willingness to take prescribed medication. A number of her responses to her counsel's questions were nonresponsive narratives. When asked if she had been diagnosed as having a problem with her weight, J.R. responded first that she had gone to Sutter Hospital for a bone density test, and then J.R. referred to an unidentified person being a client of Jackson Creek Dental as "the ones that did this to my mouth," and reported that she had osteoporosis, malnutrition, and a vitamin D deficiency. J.R. concluded by stating: "And at one point because of the three-year stay away from my legal address, and I'm not guilty, [my sister] told me she lied and she's sorry she did it."

Counsel reminded J.R. that "we want to stay on point." J.R. continued: "Because of the domestic violence and all my ER visits, and you've heard of them, I'm eligible for first and last and security deposit. First it was just at Angels Camp, San Andreas or Valley Springs, but when I told her about the housing conditions and the virus and everything, she said, well, we'll extend it to wherever you find. I found a place, it was a fixer-upper, it was a rental to buy with a yard. I thought great, I could fix it up because I was an interior decorator in Beverly Hills. I can afford furniture at the thrift stores and

---

[4] The court admitted in evidence two declarations by Dr. Hayat. The initial declaration was a form where Dr. Hayat handwrote observations or checked boxes in support of the elements of an LPS Act petition and special disabilities; the supplemental declaration confirmed the statements in the first declaration.

things and fix it up and make it beautiful and [my sister] would always be welcome where ever I am. She's sicker than a dog and I'm worried about her."

J.R.'s counsel asked her to "[s]top right there," but J.R. said: "I can get a dog. I can get a job. I have a business sense . . . ." Counsel again asked J.R. to stop and then asked her about medications she was taking, which elicited a response that included her statement that, "I've worked as a diplomate in the American Medical Association in Las Vegas, Nevada." When asked if she was willing to take her medications, J.R. responded that "I know what medication I should be on . . . they're on the front seat of my car" in a tote bag, but added that a doctor "said [I] would benefit greatly getting off Haldol and any psychotic drugs," because "I didn't even know what season it was."

After brief closing argument, the parties submitted, and the court proceeded to rule on the petition. The court found the facts alleged in the petition true, and that appointment of a conservator was necessary because J.R. was a gravely disabled person who was unwilling or incapable of accepting medical treatment voluntarily. J.R. interrupted the court's effort to articulate its order at several points, stating: "I'm going to contest it," "I'm a human being with a background," "I have every right to refuse it," and "I'm not going to allow you to do that to me" (regarding administration of psychotropic medications); and "And how long am I supposed to be a guinea pig? An experimental guinea pig."

On December 14, 2020, the court issued a written order appointing a conservator for J.R. under the LPS Act, to expire automatically within one year.[5] J.R. filed a timely appeal.

---

[5] The conservatorship terminated on December 14, 2021, rendering this appeal technically moot. (*Public Guardian of Contra Costa County v. Eric. B.* (2022) 12 Cal.5th 1085, 1094, fn. 2.) The California Supreme Court observed in *Eric. B.* that this "problem frequently arises in this area of law given the short duration of conservatorships. [Citation.]" (*Ibid.*) As the high court did in *Eric B.*, "[b]ecause the case raises important

I

*Waiver of Jury Trial*

The LPS Act " 'governs the involuntary treatment of the mentally ill in California.' [Citation.] The act 'provides one-year conservatorships for those "gravely disabled as a result of a mental health disorder or impairment by chronic alcoholism." (§ 5350.)' [Citation.]" (*Conservatorship of C.O.* (2021) 71 Cal.App.5th 894, 904 (*C.O.*).)

J.R. contends that her waiver of a jury trial on the petition for conservatorship was invalid because (1) she did not personally waive the jury, her counsel did, and (2) the waiver was not knowing and intelligent, since the trial court did not explain to her the mechanics of a jury trial and ascertain that J.R. knew what she was giving up.

We review de novo the issue whether the LPS Act requires a personal jury waiver. (*C.O., supra*, 71 Cal.App.5th at p. 903.) However, we reject J.R.'s suggestion that constitutional due process requires it. While the liberty interest at stake in conservatorship proceedings implicates constitutional concerns, whether the trial court must elicit a personal waiver from a prospective conservatee is determined by the provisions of the LPS Act itself. (See *C.O.*, at p. 914 ["we do not agree that a trial court's failure to obtain a personal waiver on the record of the proposed conservatee's right to a jury trial violates a constitutional due process right"]; see also *Conservatorship of Maldonado* (1985) 173 Cal.App.3d 144, 147-148 (*Maldonado*).) Thus, we turn to the LPS Act to resolve this issue.

The procedure for appointing a conservator under the LPS Act is set forth in section 5350. Subdivision (d)(1) of section 5350 provides in relevant part: "The person

---

issues capable of repetition but likely to evade review, we exercise our discretion to decide this otherwise moot appeal. [Citation.]" (*Ibid.*)

for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue of whether he or she is gravely disabled." In addition, "[s]ection 5350 of the LPS Act incorporates the procedures for the establishment, administration, and termination of a conservatorship in the Probate Code. Probate Code section 1827 provides for a right to a jury trial; [Probate Code] section 1828, subdivision (a)(6), requires the court to 'inform the proposed conservatee,' among other things, of his or her right 'to have the matter of the establishment of the conservatorship tried by jury.' " (*People v. Washington* (2021) 72 Cal.App.5th 453, 465, fn. 3.)

J.R. principally relies on *Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378 (*Heather W.*), where the court held: "In conservatorship proceedings pursuant to the LPS Act, the trial court must obtain a personal waiver of a jury trial from the conservatee, even when the conservatee expresses no preference for a jury trial. Absent such a waiver, the court must accord the conservatee a jury trial unless the court finds the conservatee lacks the capacity to make such a decision." (*Id.* at p. 381; see also *Conservatorship of Kevin A.* (2015) 240 Cal.App.4th 1241, 1250-1251.)

*Heather W., supra*, 245 Cal.App.5th at pages 383 to 384, in turn relied on the California Supreme Court's opinions in *People v. Blackburn* (2015) 61 Cal.4th 1113 (*Blackburn*) and *People v. Tran* (2015) 61 Cal.4th 1160 (*Tran*), companion cases clarifying the right to a jury trial of persons committed, respectively, as a mentally disordered offender (MDO) (Pen. Code, § 2972, subd. (a)(1) & (2)) or not guilty by reason of insanity (NGI) (Pen. Code, § 1026.5, subd. (b)(4) & (5)). Penal Code section 2972, subdivision (a)(1) states: "The court shall advise the person of the right to be represented by an attorney and of the right to a jury trial. The attorney for the person shall be given a copy of the petition, and any supporting documents." Penal Code section 2972, subdivision (a)(2) further states: "The trial shall be by jury unless waived by both the person and the district attorney." Penal Code section 1026.5 states in nearly identical language that "the court shall advise the person named in the petition of the right to be

9

represented by an attorney and of the right to a jury trial" (*id.*, subd. (b)(3)) and "[t]he trial shall be by jury unless waived by both the person and the prosecuting attorney" (*id.*, subd. (b)(4)).

In *Blackburn* and *Tran*, the Supreme Court held that based on the language of these statutes, a personal waiver was required unless the defendant lacked the capacity to make a knowing and voluntary waiver. (*Blackburn, supra*, 61 Cal.4th at p. 1116 ["[T]he trial court must advise the MDO defendant personally of his or her right to a jury trial and, before holding a bench trial, must obtain a personal waiver of that right from the defendant unless the court finds substantial evidence—that is, evidence sufficient to raise a reasonable doubt—that the defendant lacks the capacity to make a knowing and voluntary waiver, in which case defense counsel controls the waiver decision"]; *Tran, supra*, 61 Cal.4th at p. 1163 ["The trial court must advise the NGI defendant personally of his or her right to a jury trial and, before holding a bench trial, must obtain a personal waiver of that right from the defendant unless the court finds substantial evidence that the defendant lacks the capacity to make a knowing and voluntary waiver, in which case defense counsel controls the waiver decision"].) *Heather W.* extended *Blackburn* and *Tran* to the LPS Act. (*Heather W., supra*, 245 Cal.App.4th at pp. 383-384.)

J.R. acknowledges that the appellate court in *C.O.* disagreed with *Heather W.* In *C.O.*, as here, the prospective conservatee's attorney consulted with C.O. about whether to elect a jury or court trial, C.O. was present when his attorney informed the court C.O. wished to proceed with a bench trial, and C.O. participated in the trial and testified as a witness. (*C.O., supra*, 71 Cal.App.5th at p. 908.) The court in *C.O.* noted that *Heather W.* "did not specifically examine the applicable jury or court trial demand language of the LPS Act or compare it to the statutory language at issue in *Tran* or *Blackburn*." (*Id.* at p. 907.) The *C.O.* court observed that the trial advisement provision in Probate Code section 1828 does not contain a reference to obtaining a jury trial waiver. (*C.O.*, at p. 910.) By contrast *Blackburn* and *Tran* examined statutory schemes that contain

10

express waiver provisions, which the court emphasized in both decisions. (*Id.* at p. 911.) "[I]t was significant to the court that the MDO and NGI regimes used the same language of waiver. But it is equally important in our view that the LPS statutory scheme does not reference jury trial waiver at all." (*Id.* at p. 912.) Therefore, the court in *C.O.* held that "absent circumstances suggesting the proposed conservatee's counsel lacked actual authority, counsel disregarded his client's wishes, or the proposed conservatee was actually unaware of his right to trial by jury . . . counsel may waive on behalf of the proposed conservatee his or her right to have the establishment or reestablishment of the conservatorship decided by jury trial." (*Id.* at p. 911; see also *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 271 [valid waiver of jury trial by counsel who "stated he had spoken with his client and she wished to waive a jury trial"].) In sum, the LPS Act does not require a personal jury waiver because it lacks the waiver language of the MDO and NGI statutes relied on by the California Supreme Court in *Blackburn* and *Tran*.

Moreover, the facts in this case establishing a valid jury trial waiver are, if anything, more compelling than those in *C.O.* J.R.'s counsel stated at the November 13 hearing that he needed to further confer with J.R. regarding the choice of jury or court trial, but would "err on the side of a jury trial." When J.R. learned that a jury trial would take longer to schedule and keep her in her present facility until after Christmas, J.R. objected. The court observed that a court trial could be scheduled on an earlier date and offered to clear the courtroom for counsel to confer with J.R. on the subject. The result of their conference was counsel's statement to the court that "*we* are going to go ahead and waive jury and set a court trial." (Italics added.) This sequence of events indicates that J.R. wanted a court trial, which could be scheduled earlier, and told her counsel so. Moreover, J.R.—who had no qualms about directly addressing the court during the proceedings—said nothing to suggest that waiving the jury was anything but her desire, let alone against her wishes. (See *Conservatorship of Joanne R.* (2021) 72 Cal.App.5th 1009, 1019-1020 (*Joanne R.*) [prospective conservatee voluntarily waived jury trial when

informed that a court trial could be held that day but a jury trial could not be scheduled for nine months].)

Nonetheless, J.R. asserts that *C.O.* was wrongly decided, and that *Blackburn* and *Tran* "control this question," pointing out that a conservatorship under the LPS Act, like MDO and NGI proceedings, involves involuntary commitment. However, in *Conservatorship of John L.* (2010) 48 Cal.4th 131, the California Supreme Court held that where a proposed conservatee told his appointed attorney that he did not want to attend the hearing and the attorney so informed the court, there was no violation of the LPS Act. (*Id.* at p. 149, citing *Maldonado, supra*, 173 Cal.App.3d at p. 148.) The court in *John L.* said, "[o]ur review of the LPS Act discloses no provision purporting to bar a proposed conservatee's reliance on counsel to convey to the court a waiver of the right to attend a hearing to establish an LPS conservatorship." (*John L.*, at p. 148.) Thus, the Supreme Court relied on the language of the LPS Act to determine the validity of a waiver conveyed by counsel. The court's analysis in *John L.* is fully consistent with the *C.O.* court's conclusion that the LPS Act, unlike the MDO and NGI statutory provisions at issue in *Blackburn* and *Tran*, does not require that a proposed conservatee personally waive trial by jury.

On the issue of a knowing and intelligent waiver raised by J.R., the court in *C.O.* also held on similar facts, that substantial evidence supported the trial court's implicit conclusion that the conservatee's jury trial waiver was knowing and intelligent. (*C.O., supra*, 71 Cal.App.5th at p. 915.) "In determining whether a defendant has provided a knowing and intelligent waiver, we 'examine the totality of the circumstances.' " (*Joanne R., supra*, 72 Cal.App.5th at pp. 1017-1018, quoting *People v. Sivongxxay* (2017) 3 Cal.5th 151, 167 (*Sivongxxay*).) The court in *Sivongxxay* provided "general guidance to help ensure that a defendant's jury trial waiver is knowing and intelligent."

(*Sivongxxay*, at p. 169.)[6] But this guidance was never intended to require a " ' "specifically formulated canvass" ' " or to limit trial courts to a " 'narrow or rigid colloquy.' " (*Joanne R.*, at p. 1018, quoting *Sivongxxay*, at pp. 168, 170.)

In determining in *C.O.* that substantial evidence supported the conservatee's knowing and intelligent waiver, the court noted that the C.O. was present at both the hearing to set a trial date and the court trial. (*C.O., supra*, 71 Cal.App.5th at p. 915.) Nothing in the record indicated that C.O. disagreed with the decision to have the conservatorship decided by a court trial. (*Ibid.*) There was no evidence or suggestion in the record that C.O. did not comprehend what his counsel was representing to the court. (*Ibid.*) To the contrary, the record reflected that counsel had spoken several times with C.O. on the subject and he consented to a court trial. (*Ibid.*) There was no evidence that C.O. did not understand these communications. (*Ibid.*) C.O. was present and greeted the court when his counsel said C.O. wanted a court trial. (*Ibid.*) The appellate court concluded that based on the totality of the circumstances there was no basis to conclude that the trial court's failure to elicit a personal waiver resulted in an unfair hearing. (*Ibid.*)

So too here. At the November 13 hearing, counsel sought a jury trial until J.R. objected to the time required by the logistics required of a jury trial.[7] After the court

---

[6] The court in *Sivongxxay* recommended "that trial courts advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Sivongxxay, supra*, 3 Cal.5th at p. 169.)

[7] J.R. does not contend that the trial court induced waiver by informing her that a court trial could be scheduled earlier. As the court held in *Joanne R.*, the trial court was "simply advising her of the reality of when she could have a court or jury trial." (*Joanne R., supra*, 72 Cal.App.5th at p. 1020.)

cleared the courtroom so that counsel and J.R. could confer, counsel confirmed that J.R. and he had talked and "we are going to go ahead and waive jury and set a court trial." Like in *C.O.*, there was no evidence that J.R. did not agree with or understand what her attorney was conveying to the court. At the end of the hearing, when the trial court confirmed December 14 for the court trial date, J.R. thanked the judge. We conclude based on the record that J.R. not only intended to waive her right to a jury trial, but that the waiver of trial by jury was knowing and intelligent.

## II

### *Special Disabilities*

J.R. asserts that the special disabilities in the conservatorship order are not supported by substantial evidence and therefore deprived her of due process.

" 'If a person is found gravely disabled and a conservatorship is established, the conservatee does not forfeit legal rights or suffer legal disabilities merely by virtue of the disability. [Citations.] The court must separately determine the duties and powers of the conservator, the disabilities imposed on the conservatee, and the level of placement appropriate for the conservatee. [Citations.] The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal.' [Citation.]" (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165.)

"An appellate court reviews the trial court's factual findings to determine if there is substantial evidence to support them, and will sustain the trial court's factual findings if there is substantial evidence to support those findings, even if there exists evidence to the contrary. [Citation.] 'In making the determination [regarding substantive evidence], we view the entire record in the light most favorable to the trial court's findings. [Citations.] We must resolve all conflicts in the evidence and draw all reasonable inferences in favor of the findings. [Citation.] Substantial evidence is evidence of

14

ponderable legal significance. [Citations.]' [Citation.]" (*Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 347-348.)

The trial court's order granted the conservator the power to require J.R. to receive psychotropic medication and denied J.R. the right to refuse or consent to medical treatment.[8] (See § 5357, subd. (d).) J.R. contends that there was no evidence that J.R. was not competent to make decisions about psychotropic medication or medical treatment. J.R. argues while there was evidence that she was underweight because she needed dental surgery in order to eat properly, there was no evidence she was refusing dental treatment. Further, Peters testified that J.R. was generally taking her medications.

However, Peters also testified that prior to the temporary conservatorship, J.R. had physical ailments that were not addressed for years and she was just now becoming stable enough to have oral surgery. Before the temporary conservatorship, J.R. did not take medications long enough to stabilize. Peters testified that the biggest problem for J.R. was accepting that she needed medications and consistently taking them. Dr. Hayat testified that J.R. acknowledged that psychotropic medications helped her, but she did not believe she had a psychiatric illness. Thus, her schizophrenia hindered her ability to understand that she needed medication. Dr. Hayat's review of J.R.'s medical history revealed she had a history of canceled and missed appointments. When testifying herself, J.R. said she knew what medications she should be taking, but then immediately brought up a doctor who said she "would benefit greatly getting off Haldol and any psychotic drugs." On cross-examination, when asked if she knew medications are recommended for her mental health, J.R. responded: "Yeah. But you know what? I'm not mentally ill."

---

[8] The court also ordered that J.R. could not possess a license to operate a motor vehicle or to have a firearm. J.R. does not challenge these restrictions.

Regarding restrictions on J.R. entering into contracts or transactions of more than $50, J.R. argues the evidence was insufficient in that Peters testified J.R. handled her finances adequately even though Peters questioned the money J.R. gave to her sister. J.R. minimizes Peters's testimony, which was that J.R. has "given her sister large amounts of money to basically send to a man over in Africa for her sister . . . ." Peters continued, J.R.'s "sister asks for money quite often, and I think [J.R.] can be taken advantage of in that relationship" and "it's difficult for [J.R.] to say no." This evidence alone would be sufficient to support the restriction.

J.R. also finds insufficient Peters's testimony that "when [J.R.] is homeless, she has funds that are coming in, but she's looking for somewhere to live and then ends up giving money to the wrong people, because -- and ends up being with the wrong people and entering into these contracts that are not healthy for her." J.R. argues there is no evidence of these "unhealthy" contracts. However, Peters described the contracts as "rental agreements," and since Peters also testified that J.R. had four evictions and became homeless prior to the temporary conservatorship, the evidence supported a reasonable inference that J.R. entered into a series of rental agreements for properties from which she was subsequently evicted. Further, J.R.'s counsel's question to J.R. about her low weight led to a rambling response that "I found a place, it was fixer-upper, it was a rental to buy with a yard" that J.R. "could fix . . . up because I was an interior decorator in Beverly Hills" and "[my sister] would always be welcome wherever I am." This evidence illustrates J.R.'s thinking that would lead to an "unhealthy" contract and is sufficient to support the restriction.

We conclude the special disabilities in the conservatorship order that J.R. challenges on appeal were supported by substantial evidence.

## DISPOSITION

The order appointing the Public Conservator as the conservator of J.R.'s person and estate is affirmed.

_____/s/_____
EARL, J.

We concur:

_____/s/_____
MAURO, Acting P. J.

_____/s/_____
KRAUSE, J.